Steven V. Berson Executive Director Department of Regulatory Agencies 1560 Broadway, Suite 1550 Denver, Colorado 80202
Dear Mr. Berson:
This responds to your September 18, 1992 letter requesting an interpretation of § 11-30-103(2), C.R.S. (1992). Financial Services Commissioner David Paul (hereinafter "Commissioner Paul") has conditionally approved an application by Lowry Federal Credit Union (hereinafter "Lowry") to convert from a federally-chartered to a state-chartered credit union with a field of membership consisting of its current membership and the City of Aurora, Colorado, with some exclusions.[1] You have inquired whether § 11-30-103(2) permits such a state charter to be issued. This opinion reflects an analysis of the statutory and other legal questions you have raised. As we discuss below, setting aside public policy and business concerns, this opinion relies on relevant statutory language, case law and legislative history. Our opinion was not based on, nor does it take a position concerning, the desirability of community based credit unions at issue here.
QUESTIONS PRESENTED AND CONCLUSIONS
Your request for an Attorney General's opinion presents the following questions:
1. Do the provisions of § 11-30-103(2), C.R.S. (1992) permit a credit union to be granted a state charter if the field of membership is the residents of the City of Aurora, Colorado, with the specific exclusions ordered by Commissioner Paul?
No.
2. If § 11-30-103(2), C.R.S. (1992) permits a credit union with the field of membership as approved by Commissioner Paul, does the Banking Board have jurisdiction pursuant to state law to seek injunctive relief against Lowry to prohibit it from operating as a bank without a charter?
 This question is conditioned upon an affirmative answer to Question No. 1. Since this opinion has answered Question No. 1 in the negative, a response to this question is unnecessary.
ANALYSIS
Section 11-30-103(2), C.R.S. (1992), provides, in pertinent part:
 (2) Credit union organization and membership, other than those of a central credit union, shall be limited to groups having a common bond of employment or association or groups which reside within a well-defined neighborhood, community, or rural district having a population of no more than twenty-five thousand or as otherwise authorized by the commissioner. . . .
The language of § 11-30-103(2) describes two types of groups which qualify for credit union membership: (1) groups having a common bond of employment and association; or (2) groups which reside within a well-defined neighborhood, community or rural district having a population of no more than 25,000 or as otherwise authorized by the commissioner.
A well-established canon of statutory construction is that a statute is passed as a whole, not in parts or sections, and is guided by a general purpose and intent. Each part or section should be construed in connection with every other part or section to produce a harmonious whole. See PeoplesBank v. Banking Board, 436 P.2d 681 (Colo. 1968); Bynumv. Kautzky, 784 P.2d 735 (Colo. 1988).
The inquiry in this matter must focus on the meaning of the words ". . . having a population of twenty-five thousand or as otherwise authorized by the commissioner." It is clear that §11-30-103(2) gives the Financial Services Commissioner discretion to approve a field of membership for a geographic community which exceeds 25,000 in population. The next question is whether the commissioner's authority is unlimited.
If the phrase "or as otherwise authorized by the commissioner" is interpreted to give the commissioner authority to approve neighborhoods, communities and rural districts of any population size whatsoever for credit union membership, then the preceding phrase, "having a population of no more than twenty-five thousand," is superfluous and meaningless. A statute should be construed so that effect is given to all its provisions and no part is rendered inoperative or superfluous. SeeIn Re Estate of David v. Snelson, 776 P.2d 813
(Colo. 1989). If the language of a statute may be interpreted in two ways, one which will carry out and the other defeat the general purpose and intent of the whole act, then it should receive the interpretation which will further the general purpose and intent. See Ragsdale Brothers Roofing, Inc. v.United Bank of Denver, 744 P.2d 750 (Colo.App. 1987). "[The court's] primary task in interpreting a statute is to give it a construction and interpretation that will render it effective in accomplishing the purpose for which it was enacted." CivilService Commission v. Pinder, 812 P.2d 645, 648 (Colo. 1991).
In order to determine the general purpose and intent of a statute, a court may review background information about circumstances leading up to the enactment of the statute, events surrounding the enactment, and developments pertinent to subsequent operation of the statute. Singer, SutherlandStatutory Construction 5th Ed., § 48.01 (1992). In the matter at hand, a review of the nature and history of credit unions is warranted.
 A credit union is a democratically controlled, cooperative, nonprofit society organized for the purpose of encouraging thrift and self-reliance among its members by creating a source of credit at a fair and reasonable rate of interest in order to improve the economic and social conditions of its members. A credit union is fundamentally distinguishable from other financial institutions in that the customers may exercise effective control.
La Caisse Populaire Sante Marie v. United States,563 F.2d 505, 509 (1st Cir. 1977).
One of the traditional indicia of a credit union is the "common bond" requirement. La Caisse Populaire Sante Marie,supra at 508. The purpose of this requirement is evident from the nature of credit unions:
 The union's purposes are threatened by directors that are unmindful of members' funds or unresponsive to their collective interests. Thus, Congress ensured that federal credit unions would retain their character as self-managed cooperatives by establishing democratic principles of decision and control. The common bond provision reinforces this aim by advancing the formation of credit unions among groups that may realistically operate with unity of purpose. It encourages the election of directors who possess a common interest or occupation with the membership they serve.
Branch Bank Trust Co. v. Nat'l Credit Union AdministrationBoard, 786 F.2d 621 (4th Cir. 1986) (citations omitted).
Colorado first enacted a statute allowing the formation of credit unions in 1931. A credit union was defined as "a cooperative society, incorporated for the two-fold purpose of promoting thrift among its members and creating a source of credit for them at legitimate rates of interest for provident purposes." Membership in a credit union was limited to "groups (of both large and small membership) having a common bond of occupation or association or to groups within a well-defined neighborhood, community or rural district." 1931 Colo. Sess. Laws 80. The statute was repealed and re-enacted in 1967. The new version of the statute limited credit union membership to groups having a common bond of occupation or association. 1967 Colo. Sess. Laws 317.
In 1977, the Colorado legislature amended the credit union statute to extend credit union membership to "groups which reside within a well-defined neighborhood, community or rural district having a population of no more than twenty-five thousand or as otherwise authorized by the commissioner." The legislature also added a provision allowing small groups which have a common bond of employment or association but which lack sufficient potential membership access to existing credit unions. 1977 Colo. Sess. Laws 565. The purpose of the bill was described as follows in hearings before the Senate's Committee on Business Affairs and Labor:
 The purpose of this bill would be to bring parity between state and federal credit unions. Presently federal law does provide for a federal credit union in a well-defined neighborhood, community or rural district. Now, the limitation of twenty five thousand was placed by an amendment, which is quite fine with us. The concept is that Sterling, Colorado or Yuma or some of these other small rural areas that do have community credit unions. At the present time there are 12 federal, federally-chartered, community credit unions in the State of Colorado, because the federal act has provided for this since 1934 — state law does not. This would seek to correct this void within state law and would allow also state-chartered.
Hearing on H.B. 1290 Before the Senate Committee on BusinessAffairs and Labor, April 18, 1977 (statement of John Sheehy, Colorado Credit Union League). See alsoHearing on H.B. 1290 Before the House Committee onBusiness Affairs and Labor, March 18, 1977.
Members of the House Committee discussed the meaning of the language in the 1977 bill which set a population limit of 25,000 and gave the commissioner (at that time, the Bank Commissioner) authority to approve larger groups. Although the quality of the audio tapes of the hearing is very poor,[1] it is clear that the 25,000 population limit was based upon the federal regulator's, the National Credit Union Administration (hereinafter NCUA), population limit of 25,000 at that time. There were discussions relating to why a population limit should be imposed, such as the following statement by an Assistant Attorney General who appeared at the hearing on behalf of the State Bank Commissioner: "What the amendment intends to do is to prevent a group of say ten block square area in the City of Denver from coming in and saying we are a well-defined neighborhood and we want to be eligible for a credit union." A legislator made the following statement: "Without this language in there, the twenty five thousand, it would be possible for a credit union to just expand throughout the whole City of Denver without some kind of limitation as to size." In the discussion concerning the amendment to the bill which gave the commissioner discretion to authorize groups with populations in excess of 25,000, the only example discussed was a community of "twenty five, five hundred or something like that. . . ." Hearing onH.B. 1290 Before the House Committee on BusinessAffairs and Labor, March 18, 1977.
As mentioned previously, at the time House Bill 1290 was passed, the NCUA's population limit was 25,000. The limit used by the NCUA is set by informal policy, and is not contained in statutes or regulations. The policy differs within the NCUA, with each regional office setting its own population limit. Colorado is located in Region V, which currently has a population limit of 110,000.[2] Under special circumstances, this limit may be exceeded, but approval to do so must come from the National Credit Union Administration Board.[3]
The NCUA has set forth its policies and procedures for granting and permitting change to a federal credit union charter in itsChartering and Field of Membership Manual. Concerning community fields of membership, the manual states as follows:
 3. Community Common Bonds. Congress has required that a credit union charter that will be based on a tie to a specific geographic location be limited to "a well-defined neighborhood, community, or rural district." NCUA policy is to limit the community to a single, compact, well-defined area where residents commingle and interact regularly. NCUA recognizes two types of affinity on which a community charter bond can be based: residence and employment. Businesses and other legal entities within the community boundaries may also qualify for membership. Given the diversity of community characteristics throughout the country and NCUA's goal of making credit union service available to all eligible groups who wish to have it, NCUA has established the following common bond requirements:
 a. The geographic area's boundaries must be clearly defined; and
 b. The charter applicant must establish that the area is recognized by those who live and/or work there as a distinct "neighborhood, community, or rural district."
National Credit Union Administration, Chartering and Fieldof Membership Manual, pp. 1-3 (12-89).
Lowry is a federally-chartered credit union which was initially established to serve the military and civilian population of Lowry Air Force Base. Presently, Lowry's membership base consists of those persons with the "common bond" of employment at or assignment to Lowry Air Force Base (including civilian and military personnel of the United States government as well as employees of several other employers located on the base), and employees and members of a large number of other diverse entities, including, for example, employees of fifty-five named businesses located in Englewood, Aurora and Denver, Colorado, natural person members of the Aurora Board of Realtors, and employees and parishioners of fifteen named churches.[4] After the announcement in 1991 that Lowry Air Force Base was scheduled for closure by 1994, Lowry's management approached its regulator, the NCUA, to request an expansion of its membership base.[5] Lowry sought to expand its membership base to include a geographic community, the City of Aurora. Lowry's application was denied by the NCUA regional office because the NCUA requires that a credit union have either a common bond field of membership or a community field of membership, and does not permit overlapping of the two.[6] Lowry sought to add a community to its field of membership while retaining its common bond component. This was not permissible.[7]
Lowry's management then approached Colorado's regulator of credit unions, the Division of Financial Services, to apply for conversion from a federally-chartered credit union to a state-chartered credit union with a field of membership consisting of those persons already eligible for membership in Lowry plus a geographic community, the City of Aurora. On June 4, 1992, Commissioner Paul conditionally approved Lowry's application for conversion to a state-chartered credit union with a field of membership consisting of the persons previously eligible for membership in Lowry and, in addition, the residents of the City of Aurora, including all relatives by birth, marriage and adoption, with the exclusion of the existing members of ten credit unions which currently operate in the City of Aurora.[8]
Clearly, the language of § 11-30-103(2) gives the Financial Services Commissioner discretionary authority to approve credit union membership for groups residing in neighborhoods, communities or rural districts with populations in excess of twenty-five thousand. However, the Commissioner's discretion is not unlimited. In our view, both the wording of the statute itself and the extrinsic evidence available (including legislative history and history concerning the nature and purpose of credit unions) indicate that the legislature did not intend to grant the Commissioner unbridled authority. The question, then, is whether the Commissioner has authority under §11-30-103(2), to grant a state charter to a credit union with a field of membership consisting of its current "common bond" membership and a geographic community with a population in excess of 200,000.[9]
From the legislative history available, it appears that the legislative purpose behind the extension of credit union membership to groups residing within well defined neighborhoods, communities or rural areas was parity between state and federal law.[10] The language which gave the Commissioner authority to exceed the population limit was added on to the bill during a House Committee hearing.[11] The legislative history available concerning this language indicates that the legislature's purpose was to provide the Commissioner with some flexibility concerning population size while preventing unlimited expansion. Maintaining numerical parity with the NCUA was not discussed.[12]
Section 11-30-103(2) sets out a specific population limit of 25,000. General language, "or as otherwise authorized by the Commissioner," follows this specific limit. Where words of general import follow specific designations, the application of the general language is controlled by the specific. Shimmelv. People, 108 Colo. 592, 121 P.2d 491 (1942); Bowmanv. Eldher, 149 Colo. 551, 369 P.2d 977 (1962). In interpreting § 11-30-103(2), both the phrasing of the statute and the legislative history available lead to the conclusion that the legislature intended to allow the Commissioner reasonable flexibility to grant credit union charters to well-defined neighborhoods, communities or rural districts with populations slightly in excess of 25,000.[13] This interpretation of the statute is in accord with one of the basic purposes of the "common bond" requirement (which applies equally to a "community" credit union): to ensure that the group may realistically operate with unity of purpose, thereby enhancing the goal of economic feasibility.
SUMMARY
Section 11-30-103(2) does not permit the chartering of a credit union with a field of membership consisting of a community the size of the City of Aurora.
Sincerely,
 GALE A. NORTON Attorney General
CREDIT UNIONS STATUTORY CONSTRUCTION STATE AGENCIES
§ 11-30-103(2), C.R.S. (1992)
REGULATORY AGENCIES, DEPT. Banking, Div. of
Section 11-30-103(2), C.R.S. (1992) does not permit the charting of a credit union with a field of membership consisting of a community the size of the City of Aurora.
[1] The population of the City of Aurora is 222,000, according to 1990 Census information.
[1] The quality of the audio tapes in the custody of the Archives and Public Records Division, Department of Administration, has deteriorated significantly. The Archives tape of the Senate Committee hearing on April 18, 1977 is still audible; however, the Archives tape of the House Committee hearing on March 18, 1977 is incomprehensible. A transcript of the House committee hearing supplied by the Division of Banking (which transcript was obtained from a tape made from the Archives tape prior to its deterioration) was used by this office. The Colorado Credit Union League also has a tape of the House Committee hearing made from the archives tape prior to its deterioration. Commissioner Paul used that tape in making his determination on Lowry's application for conversion. The Credit Union League tape was compared to the transcript supplied by the Division of Banking and no significant differences were found.
[2] At the present time, there are twelve federally chartered, "community" credit unions in Colorado. Except for one serving the city of Pueblo, which has a population of 98,640, according to 1990 census figures, these credit unions serve communities which have populations less than 25,000.
[3] Telephone conference with Gene Jackson, Director of Division of Insurance, NCUA Region V (September 24, 1992).
[4] NCUA Region V, Amendment to Charter, Lowry Federal Credit Union (May 19, 1992).
[5] Colorado Division of Financial Affairs, Department of Regulatory Agencies, Background and Rationale for LowryFederal Credit Union Charter Approval and Field ofMembership Expansion (September 8, 1992) (hereinafter "Background and Rationale"); telephone conference with Gene Jackson, supra.
[6] This opinion does not opine on the issue of overlapping common bond and community based membership fields.
[7] Telephone conference with Gene Jackson, supra.
[8] Background and Rationale, supra, at 1-2.
[9] Commissioner Paul excluded the membership of existing credit unions located in the City of Aurora from Lowry's field of membership, and has taken the position that those residents should not be counted in the population figures. However, the wording of 11-30-103(2) allows membership in credit unions by groups in well-defined communities. The well-defined community at issue in this instance is the City of Aurora, not the City of Aurora minus the members of existing credit unions. The population of the entire city, 222,000, is the appropriate figure to be used.
[10] Hearing on H.B. 1290 Before the Senate Committee onBusiness Affairs and Labor, April 18, 1977;Hearing on H.B. 1290 Before the House Committee onBusiness Affairs and Labor, March 18, 1977 (hereinafterHouse Committee Hearing).
[11] House Committee Hearing; see alsoSecond Reading in the House of H.B. 1290, March 31, 1977.
[12] House Committee Hearing.
[13] An argument has been made that the legislature intended to allow the Commissioner authority to raise the state population limit as the NCUA's population limit increased to provide for continuing numerical parity between the state and federal law. Even if such numerical parity was intended by the legislature, the current population limit (based on the NCUA limit), would be 110,000. The City of Aurora's population exceeds that number.